ELVIN L. ROBERTSON, Plaintiff-Appellee, *v.* TRAVELERS INSURANCE COMPANY, Defendant-Appellant.

Fifth District   No. 79-599

Opinion filed September 28, 1981.

JONES, J., dissenting.

Haskell & Perrin, of Chicago, and Dunham, Boman & Leskera, of East St. Louis (Donald M. Haskell and Mitchell A. Orpett, of counsel), for appellant.

Charles E. Hamilton, of Listeman, Bandy & Hamilton, of Belleville, for appellee.

Mr. JUSTICE WELCH* delivered the opinion of the court:

On March 28, 1975, plaintiff, Elvin L. Robertson, filed a one-count complaint in the Circuit Court of St. Clair County against: (1) his employer, Kaskaskia Constructors (Kaskaskia); (2) Kaskaskia's workmen's compensation insurer, Travelers Insurance Company (Travelers); and (3) several employees of Travelers. The complaint alleged that defendants had caused plaintiff to suffer severe mental anguish, and that they had committed the tort of "outrage" against plaintiff by their handling of his workmen's compensation claim. An amended complaint, filed on April 16, 1979, dropped Kaskaskia as a defendant, and a jury trial commenced on April 30, 1979. At the conclusion of plaintiff's evidence the individual employees of Travelers were dismissed as defendants. A jury verdict in the amount of $150,000 compensatory damages and $2,000,000 punitive damages was returned against Travelers, and judgment was entered on the verdict. Travelers appeals that judgment.

The evidence presented was largely undisputed. It established that on June 25, 1971, plaintiff was a carpenter employed by Kaskaskia at the Fults Lock and Dam project. At that time plaintiff slipped and fell, and although an injury was sustained there was later a dispute as to whether one or both of his knees were injured. As a result of the injury plaintiff consulted several doctors for treatment, and Travelers paid for most of those expenses. The only benefit which plaintiff received directly was a temporary total disability payment which Travelers sent on March 22, 1972, and plaintiff received on March 30, 1972. Under the law as it then existed plaintiff was required to file his claim for workmen's compensation before the Industrial Commission no later than one year after the date upon which he last received direct benefits (Ill. Rev. Stat. 1969, ch. 48, pars. 138.6(c)(3) and 138.8(a)). In plaintiff's case the limitations period would therefore expire on March 30, 1973.

Plaintiff testified that on March 14, 1973, shortly before the statutory period would expire, he telephoned Travelers' agent Thomas Walz. Walz had been in charge of plaintiff's case and plaintiff had contacted him on

---

* Judge Thomas M. Welch replaced Judge Dorothy W. Spomer on the panel as Judge Spomer retired from the bench during the pendency of this appeal.

several occasions. Plaintiff informed Walz that surgery on both knees would begin in the next month and Walz told plaintiff that Travelers' name could be put on the bill. Walz admitted telling plaintiff that Travelers' name could be placed on the bill, but Walz testified that in addition he told plaintiff that other agents were now in charge of the case and they would have to make the final decision on whether to pay for the surgery. Plaintiff testified that he did not recall that portion of the conversation, but stated Walz may have said that.

On March 16, 1973, supervisor James Balsiger wrote a memorandum to the claims representative, Rodger Nelson, who had been assigned to plaintiff's claim. Balsiger noted:

"On March 14, Mr. Walz of our office received a phone call from this man [plaintiff]. The man indicated that he was going in the hospital in April to have his knee operated on. * * * The man asked Mr. Walz who would pay for this operation and apparently Mr. Walz told the man 'they can put our name on the bill if they want to.' What impression the man got from the statements I do not know."

In the memorandum, Balsiger stated his belief that the claim was questionable because a medical diagnosis indicated that plaintiff's condition may have been due to a degenerative health problem rather than caused by injury. He continued:

"As can be noted, the statute of limitations were run [sic] on this case on March 22, 1973. I would suggest that we contact this man and determine what doctor is going to do what to him and on what date. I would make it clear to him that we are accepting no responsibility for this and are not going to pay compensation. I think we are in such a position at this time that we cannot voluntarily accept this matter."

Acting under the misapprehension that the statute of limitations would run on March 22, rather than March 30, Travelers' employees made no attempt to contact the plaintiff before March 22. Claims representative Nelson conducted a lengthy interview of the plaintiff at his home on March 26. Nelson did not remind him of the running of the statute of limitations, but he did ask the plaintiff whether he had retained an attorney or filed a workmen's compensation claim. The plaintiff responded in the negative.

On March 29, Nelson wrote the plaintiff a letter which stated:

"On examination of all information available regarding the above workmen's compensation claim, we feel that your present complaints are not as a result of the above incident. Therefore, Travelers Insurance Company will not authorize or accept the responsibility of any additional medical treatment or temporary total

disability benefits regarding the above incident. May I suggest you contact your Group Insurance carrier for possible Group Insurance Benefits?"

Plaintiff received this letter on April 2, 1973. Only then did he consult an attorney for the first time, and a formal application for adjustment of claim was sent to the Industrial Commission that same day.

Claims representative Nelson wrote a memorandum to the file on April 11, 1973. He remarked that, in his view, the statute of limitations had expired before his interview and subsequent correspondence with the plaintiff. He further detailed:

"On 4-3-73, this writer discussed the above case with Supervisor Balsiger and Claims Attorney Knobbe and both of these individuals agree with this writer that the statute of limitations has expired and unless Mr. Robertson lied about retaining an attorney or previously filing an application, for adjustment, The Travelers Insurance Company should be 'home free.' "

Travelers defended against plaintiff's workmen's compensation claim by asserting the statute of limitations. The issue was litigated by the parties, and finally resolved by the supreme court in *Kaskaskia Constructors v. Industrial Com.* (1975), 61 Ill. 2d 532, 337 N.E.2d 713. In that case the supreme court held that the Industrial Commission's ruling, that Travelers was estopped from asserting the statute of limitations, was not contrary to the manifest weight of the evidence. It was only after that ruling that Travelers paid plaintiff's claim plus accrued interest.

In the meantime the plaintiff, who was recovering from surgery, could not work. He was forced to borrow from relatives, go on public aid, and accept charity from the volunteer fire department of which he was a long-standing member, in order to provide for his family. This financial strain upset the plaintiff and caused him to become, in his own words, "highly nervous and forgetful."

On appeal, Travelers attacks the judgment against it by advancing a number of arguments, of varying degrees of merit. As its first block of arguments, Travelers contends that the plaintiff may not bring an outrage suit against it, for such a claim is barred by (1) the Illinois Insurance Code (Ill. Rev. Stat. 1979, ch. 73, par. 767), (2) the exclusivity provisions of Illinois' Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.5(a)), and (3) the Illinois and Federal constitutions. It then urges us to find that the plaintiff did not plead or prove that he was entitled to compensatory or punitive damages. Finally, it is claimed that various errors below denied Travelers a fair trial.

The tort of "outrage" or "intentional infliction of emotional distress" became a part of the law of Illinois two decades ago. (*Knierim v. Izzo* (1961), 22 Ill. 2d 73, 174 N.E.2d 157). Although the Illinois Supreme Court

has not been presented with the issue, other tribunals in this State have conceded, if occasionally only in *dicta*, that an insurer would be liable for its outrageous conduct. (*Eckenrode v. Life of America Insurance Co.* (7th Cir. 1972), 470 F.2d 1; *Ledingham v. Blue Cross Plan* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, *rev'd on other grounds* (1976), 64 Ill. 2d 338, 356 N.E.2d 75; *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 371 N.E.2d 373; *Urfer v. Country Mutual Insurance Co.* (1978), 60 Ill. App. 3d 469, 376 N.E.2d 1073; *Siegal v. Health Care Service Corp.* (1980), 81 Ill. App. 3d 784, 401 N.E.2d 1037; *Tobolt v. Allstate Insurance Co.* (1979), 75 Ill. App. 3d 57, 393 N.E.2d 1171). Travelers seeks to avoid the application of the tort of outrage to the insurance industry by asserting that section 155 of the Illinois Insurance Code (Ill. Rev. Stat. 1979, ch. 73, par. 767) allows the plaintiff to recover attorney fees for an insurer's "vexatious refusal to pay" and thus bars all other recoveries. However, in this case, the plaintiff was not an insured, but was a third-party claimant on a policy issued by Travelers, and as Travelers concedes, the remedies of section 155 are not available to third-party claimants. (*Stamps v. Caldwell* (1971), 133 Ill. App. 2d 524, 273 N.E.2d 489; *Scroggins v. Allstate Insurance Co.* (1979), 74 Ill. App. 3d 1027, 393 N.E.2d 718.) Therefore, even if section 155 would bar an outrage suit by an insured against its insurer, it cannot possibly preclude this suit by this plaintiff, who is not entitled to partake of the benefits accorded by section 155.

In a similar vein, it is argued that the plaintiff is not entitled to recovery beyond the scope of the Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138—1 *et seq.*) for outrageous conduct concerning an injury which would be compensable under that Act. Travelers directs our attention to *Collier v. Wagner Castings Co.* (1979), 70 Ill. App. 3d 233, 388 N.E.2d 265, where it was held that an employee could not sue his employer for outrage involving an on-the-job injury unless actual intent is alleged. Plaintiff Collier stated that his employer did not provide him with adequate medical care and did not arrange for him to be transported to a hospital, even though he exhibited symptoms of a heart attack while at work. Instead, defendant's employees diagnosed plaintiff's complaints as indigestion, and refused his requests for outside medical help for three hours, during which time the plaintiff vomited in a sink in defendant's first aid station. A co-worker finally called the plaintiff's wife, who took him to a hospital, where he suffered three episodes of cardiac arrest.

In a 2-1 decision, the Fourth District held that, while Collier's complaint may have alleged "gross and wanton conduct" by the defendants, it did not plead that they acted with "actual intent to injure" him. Consequently, the action was said to have been barred by the exclusivity provisions of the Workers' Compensation Act. (Ill. Rev. Stat. 1979, ch. 48, par. 138.5(a).) We do not believe that the result in *Collier* must be fol-

lowed here, because this case is distinguishable from *Collier* on three grounds.

First, while Collier sued his employer, the plaintiff in this case sued his employer's workmen's compensation insurer. (Compare Ill. Rev. Stat. 1979, ch. 48, par. 138.11.) Second, while Collier sued for injuries which occurred while he was "engaged in the line of his duty" (Ill. Rev. Stat. 1979, ch. 48, par. 138.5(a)), this plaintiff sought compensation for injuries resulting from conduct which occurred long after he had ceased to work for Kaskaskia. Finally, even if Collier's complaint failed to allege intentional conduct by the defendants, Robertson here claimed that Travelers "fraudulently and maliciously induced plaintiff to rely on their assurances of fair treatment until mroe [*sic*] than one year had elapsed since the date of last payment of compensation, before notifying plaintiff of their intentions not to honor their obligations under the workmen's compensation act."

The plaintiff specifically alleged that Travelers intended to injure him. Thus, the rule of *Collier* would not apply here by its own terms, even if *Collier* would be extended to cover outrageous conduct committed by the employer's insurer outside the workplace. But see *Kelsay v. Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353.

For similar reasons, this action is not superseded by the remedy of section 19(k) of the Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.19(k)). According to its terms, that provision grants a penalty to the claimant for "unreasonable or vexatious delay of payment" of a workers' compensation claim. The person or entity responsible for payment need not act with intent to injure the claimant in order to be liable under this section. (*Board of Education v. Industrial Com.* (1968), 39 Ill. 2d 167, 233 N.E.2d 362.) As plaintiff's complaint alleged that Travelers acted with the intent to injure him, and as it claimed that Travelers did more than simply delay in paying him, it goes well beyond the requirements of section 19(k). To construe this section to prohibit plaintiff's action for outrage would require us to read more into the language of this provision than is there. Defendant cites no authority for the proposition that this section bars recovery for delay in payment done with the intent to injure him, and we have not found any such case. The permissible recovery available under section 19(k) cannot be said to bar plaintiff's outrage suit.

As its final argument against the plaintiff's ability to maintain this action, Travelers asserts that to allow this suit would deprive it of constitutional rights. This argument is somewhat nebulous, but, as we understand it, Travelers claims that the maintenance of this action materially impairs its contractual obligation to defend against the plaintiff's claim, and thus violates the contracts clause of the Illinois and Federal consti-

tutions. We do not see how it can seriously be contended that to allow an outrage suit for the tortious processing of a workmen's compensation claim is unconstitutional simply because the defendant is obligated by contract to assert defenses against that claim.

■■ To summarize the arguments thus far, the plaintiff's outrage suit against his employer's workmen's compensation insurer is not barred by the Illinois Insurance Code or Workmen's Compensation Act, or on constitutional grounds. In order to determine whether the plaintiff has stated a cause of action for intentional infliction of emotional distress, and whether he is entitled to the damages granted at trial, we must examine those cases which have applied this tort to the handling of insurance claims.

The starting point for the application of the tort of outrage to the insurance industry in Illinois is our opinion in *Ledingham v. Blue Cross Plan* (1975), 29 Ill. App. 3d 339, 330 N.E.2d 540, *rev'd on other grounds* (1976), 64 Ill. 2d 338, 356 N.E.2d 75. There, we noted that a plaintiff could sue an insurer under either of two tort theories. First, if the actions of the insurer are in bad faith and outrageous, the plaintiff may recover compensatory damages for the intentional infliction of emotional distress, but not punitive damages. Second, if the insurer makes threatened and actual bad faith refusals to pay, accompanied by false and threatening communications designed to cause the other party to surrender his policy or settle to his disadvantage, then punitive damages may be appropriate. There has been some controversy surrounding the existence of the second, "bad faith refusal" tort recognized in *Ledingham* and the availability of punitive damages under that tort. (See discussions in *Lynch v. Mid-America Fire & Marine Insurance Co.* (1981), 94 Ill. App. 3d 21, 418 N.E.2d 421, and *Hoffman v. Allstate Insurance Co.* (1980), 85 Ill. App. 3d 631, 407 N.E.2d 156.) However, as noted above, Illinois law holds an insurer liable for its outrageous conduct in settling or handling a claim.

The plaintiff in *Ledingham* showed signs of an illness two days after the effective date of the policy issued by the defendant. The defendant refused payment because it asserted, according to an exemption in the policy, that the illness was contracted within 270 days before the effective date of the policy. We found no evidence that the defendant ever accused the plaintiff of fabricating her claim, that the defendant attempted to use false defenses to force her to settle, or that it acted to delay excessively her payments. It is obvious that the conduct of the defendant in *Ledingham* in no way resembles the conduct of the defendant in this case. Our finding of no outrageous activity in *Ledingham* thus does not control the result here.

In *Debolt v. Mutual of Omaha* (1978), 56 Ill. App. 3d 111, 114, 371 N.E.2d 373, 376, the plaintiff's allegations of misconduct by the defendant

were that it "ultimately denied liability under the disability policy, that it referred the plaintiff's claim from its Illinois office to its Nebraska office, and that it offered to settle a disputed claim with the plaintiff in return for a surrender of the policy." The appellate court properly affirmed the dismissal of plaintiff's complaint as it failed to allege specific facts which could be interpreted as outrageous conduct by the defendant.

Similarly, the dismissal of plaintiff's complaint was affirmed in *Tobolt v. Allstate Insurance Co.* (1979), 75 Ill. App. 3d 57, 393 N.E.2d 1171. According to the complaint, the insurer acted outrageously in failing to pay the plaintiffs the amount requested under a fire insurance policy. The court stated that the correspondence attached to the complaint showed that the insurer never disputed its liability. It only differed with the plaintiffs on the amount of the loss, and, as the Illinois Department of Insurance suggested upon its review of the case, there was a proper basis for dispute. The insurer did not make any abusive communications with the plaintiffs, or offer any untrue defenses. The complaint showed simply that the insurer "adjusted the loss based upon its own investigation and the independent investigation of plaintiffs' public adjuster" (75 Ill. App. 3d 57, 65-66, 393 N.E.2d 1171, 1177) which is well within the realm of insistence upon one's legal rights in a permissible way.

The plaintiffs in *Ledingham, Debolt* and *Tobolt* thus failed to allege outrageous conduct by their respective insurers. Indeed, our research has not uncovered a case in the courts of this State in which plaintiffs have met their burden of pleading against an insurer for this tort. However, in *Eckenrode v. Life of America Insurance Co.* (7th Cir. 1972), 470 F.2d 1, the Seventh Circuit found that the plaintiff had stated such a cause of action under Illinois law. The facts alleged to constitute outrageous conduct were as follows:

> "Defendant's life insurance policy covering plaintiff's husband issued September 22, 1967. Under the policy Insurer agreed to pay plaintiff $5,000 immediately upon due proof of death from 'accidental causes.' On December 17, 1967, insured was an accidental victim of a homicide. Plaintiff met all conditions of the policy and repeatedly demanded payment, but Insurer refused to pay. Decedent left plaintiff with several children, but no property of value. She had no money, none even for the funeral expenses. Denied payment by Insurer, she was required to borrow money to support her family, while her financial condition worsened. The family was required to live with, and accept charity from, relatives.

> FURTHER: Insurer knew or should have known of the death of decedent from accidental causes and of plaintiff's dire need of the policy proceeds. Yet Insurer repeatedly and deliberately refused

her demands for payment, and as a proximate result she was caused to suffer 'severe distress and disturbance of [her] mental tranquility.' Instead of paying her the proceeds of the policy, and being fully aware of the accidental cause of decedent's death and of plaintiff's financial distress, Insurer breached the policy promise to pay immediately upon proof of death. Insurer, knowing full well that plaintiff needed the proceeds of the policy to provide necessaries for her children, applied 'economic coercion' in refusing to make payment on the policy, and in 'inviting' plaintiff to 'compromise' her claim by implying it (Insurer) had a valid defense to the claim."

■■ When this case is compared to *Eckenrode*, it is apparent that the conduct of this defendant is at least as outrageous as the conduct held actionable by the Seventh Circuit. In some respects, the deviousness of Travelers' employees renders their actions even more reprehensible. Furthermore, the plaintiff here suffered injury comparable to that suffered by Mrs. Eckenrode, as he was forced to go on public aid, borrow from relatives and accept charity from the church and volunteer fire department to which he belonged. He claimed that this financial distress, which the defendant knew would result from his hospitalization and subsequent recuperation without benefits, caused him serious mental strain. All of these facts, alleged by the plaintiff, show conduct significantly more outrageous than that in *Ledingham, Debolt,* and *Tobolt.* His complaint resembles that in *Eckenrode*, and thus states a cause of action in outrage under Illinois law.

Moreover, the evidence introduced at trial conforms to the allegations in the complaint. As this evidence was largely uncontested, we reject Travelers' claim that neither the complaint nor the proof at trial is sufficient to establish its liability to the plaintiff.

However, we do agree with Travelers that the judgment entered against it was erroneous in one respect. When the tort of outrage was incorporated into the law of Illinois, the supreme court ruled that punitive damages may not be recovered in such an action. It was stated that "[s]ince the outrageous quality of the defendant's conduct forms the basis of the action, the rendition of compensatory damages will be sufficiently punitive." (*Knierim v. Izzo* (1961), 22 Ill. 2d 73, 88, 174 N.E.2d 157, 165.) As this theory has been a well-established part of the law in Illinois, we must reverse the portion of the judgment which awards punitive damages. *Eckenrode v. Life of America Insurance Co.* (7th Cir. 1972), 470 F.2d 1.

Since the case was tried upon a theory which would permit the recovery of punitive damages, we must assess the impact of this error on the rest of the judgment. In general, a new trial should be awarded if the

case is tried under an erroneous theory of law. (*Woolsey v. Rupel* (1957), 13 Ill. App. 2d 48, 140 N.E.2d 855.) In this case, the trial court allowed the jury to hear evidence on matters which would only pertain to the award of punitive damages, such as testimony concerning the assets of the defendant. It permitted the lawyers to discuss the propriety of punitive damages in argument, and it instructed the jury that it could, if it chose, grant recovery in the form of these damages. The use of this erroneous theory at trial is beyond doubt.

However, the improper request for punitive damages could not have affected the jury's decision that the plaintiff had established the defendant's liability. That evidence, as we noted above, was largely unchallenged. Instead, we feel that the amount of compensatory damages could have been affected by a trial with a prayer for punitive damages. Where, as here, the reason that punitive damages are improper is because the conduct necessary to prove entitlement to those damages is the same as that required to recover compensatory damages, trial on a theory allowing for the recovery of both may have confused the jury and influenced its decision on compensatory damages. It is difficult to tell whether the jury would have awarded a greater amount, a smaller amount, or the same amount of compensatory damages, had the option of punitive damages been unavailable. It cannot be said then which party would be prejudiced by severing the award of punitive damages from the award of compensatory damages and affirming only the latter, but, to uphold the compensatory damage portion of the judgment would deny at least one party a fair trial on the issue of damages.

■■ It appears to us, therefore, that an appropriate remedy would be to remand this cause for a new trial on the issue of damages alone. In order to invoke this procedure, we must find the damage issue to "be so separable and distinct from the issue of liability that a trial of damages alone may be had without injustice." (*Sommer v. City of Taylorville* (1978), 59 Ill. App. 3d 765, 375 N.E.2d 1031, 1032.) The conduct leading to defendant's liability is both undisputed and easily severable from the elements of damage suffered by the plaintiff. By granting a new trial on the issue of damages alone, we cure all prejudice which could have resulted from the references to punitive damages, and we use a remedy which seems ideally suited to the facts of this case.

Finally, Travelers mentions approximately a dozen errors which took place at trial and which were allegedly prejudicial. These errors relate predominantly to jury instructions, voir dire examination of jurors and the admission of certain testimony. Some of these errors were waived for failure to object to them at trial. Others relate solely to the issue of damages and need not be considered, given our disposition of the case.

The remaining errors, when taken together, are insufficient to cast doubts on the jury's determination of defendant's liability to the plaintiff. They are, at most, harmless error.

For the reasons enumerated above, we affirm that portion of the judgment of the Circuit Court of St. Clair County which holds that the defendant is liable in outrage to the plaintiff. We reverse that portion of the judgment which grants punitive damages, and we remand this cause for a new trial on the issue of compensatory damages.

Affirmed in part, reversed in part, and remanded.

HARRISON, J., concurs.

Mr. JUSTICE JONES, dissenting:
I respectfully dissent.

The majority has purported to analyze the Illinois law of intentional infliction of severe emotional distress without so much as mentioning the latest case of our supreme court to consider that tort. (*Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 360 N.E.2d 765.) The omission immediately flaws the analysis, and it cannot be excused by the suggestion that some distinction exists when the tort of intentional infliction of severe emotional distress is applied to "the insurance industry." There can be no such distinction, of course, for the tort possesses traits of its own that, when present, will apply to any area of law.

In *Public Finance Corp. v. Davis*, our supreme court considered in detail the tort of intentional infliction of severe emotional distress. The court commented upon the Restatement (Second) of Torts §46 (1965), law review articles and cases from other jurisdictions in deciding that upon the alleged facts before it no cause of action had been stated. No purpose would be served by reciting here the salient points of the *Davis* decision. We do not consider the sufficiency of the allegations in a complaint for the case has been tried and the facts are established. When those facts are considered in the light of *Davis*, it is apparent the plaintiff has failed to prove a tenable case.

No conduct of the defendant towards the plaintiff could be termed outrageous. From the time of plaintiff's injury the defendant disputed whether there had been an injury to both his knees. Defendant paid several doctors for treating plaintiff and paid some temporary total disability payments, all pursuant to the Workmen's Compensation Act. When plaintiff told agent Walz that he was to have surgery on both knees on March 14, 1973, Walz told plaintiff that defendant's name could be put on the bill. Walz stated that he also told plaintiff that other agents were in

charge of the case and they would have the final decision on whether to pay for the surgery. Plaintiff stated that Walz "may have said that." The Balsiger memorandum of March 16, 1973, stated the belief that plaintiff's condition resulted from a degenerative health problem rather than from an injury. The position thus taken was legitimate, founded on medical advice and not born of an insidious scheme to defeat plaintiff's claim. In any event, the memorandum was strictly "in house" and was not communicated to the plaintiff. In the interview with plaintiff on March 26, representative Nelson said nothing about the statute of limitations, but he did inquire of plaintiff whether he had retained an attorney or filed a claim. Again, there was nothing in the conduct of Nelson at that time that could be considered outrageous. The Nelson letter to plaintiff on March 29 was apparently a follow-up of the March 26 visit and interview. Although doubtless a disappointment to the plaintiff, it is nevertheless a bland disclaimer of liability on the part of the defendant. The position taken in the memorandum had a legitimate foundation in medical opinion. A refusal to pay voluntarily under that circumstance cannot be termed outrageous.

The Nelson memorandum *to the file* written on April 11, 1973, used a callous phrase, "The Travelers Insurance Company should be home free," in reference to the fact that the statute of limitations on the filing of a workmen's compensation claim had then run. However, that memorandum and that phrase were never communicated to the plaintiff and accordingly could not have caused him any distress.

Squarely applicable to this case is the quotation from Restatement (Second) of Torts §46, comment g (1965):

"The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."

This excerpt from comment g was expressly adopted in *Public Finance Corp. v. Davis* (1976), 66 Ill. 2d 85, 92, 360 N.E.2d 765, 768.

The majority characterized the "injury" to the plaintiff in the following terms:

"He was forced to borrow from relatives, go on public aid, and accept charity from the volunteer fire department of which he was a long-standing member, in order to provide for his family. This financial strain upset the plaintiff and caused him to become, in his own words, 'highly nervous and forgetful.' "

It is submitted that the condition in which plaintiff found himself resulted from the mere denial of his claim by the defendant. In point of fact, defendant was not shown to have done anything other than deny plaintiff's claim, and that denial was for legitimate reasons.

When plaintiff finally did retain an attorney and file his claim for workmen's compensation, the arbitrator who heard his case denied the claim on the grounds that it was barred by the statute of limitations. The Industrial Commission reversed on the grounds that plaintiff's physical condition was not yet permanent, and the circuit court affirmed the Industrial Commission. On appeal, the supreme court in *Kaskaskia Constructors v. Industrial Com.* affirmed, with two justices dissenting. Thus, the fact that in the workmen's compensation adjudication procedure the arbitrator entered an order favorable to defendant and the ultimate decision for plaintiff was by a divided supreme court belie any assertion that defendant's conduct in denying liability and placing reliance on the statute of limitations was outrageous conduct. To the contrary, it can be said that plaintiff's distress was the result of his own failure to retain an attorney when defendant first ceased the payment of temporary total compensation. By his own action plaintiff could have alleviated the severity of his circumstances, and it is improper to lay the blame upon defendant when all it had done was assert its legal rights.

The facts of this case are far afield from those in the *Eckenrode* case, and the conduct of the defendant here cannot be deemed equivalent to the conduct of the defendant in that case.

The finding of "outrageous conduct" by the majority here will cast a pall upon the insurance business in Illinois. The denial of a claim, no matter how justifiable, will inevitably bring forth a two-count complaint for compensation, one count for recovery under the policy, and the second for intentional infliction of severe emotional distress. Under the authority of the majority decision it will in all cases be merely a question for the jury.

Not only do I disagree with the treatment of the "outrageous conduct" aspect of the case, I also disagree with the propriety of remanding the case for a new trial as to damages. However, in the interest of brevity I will not comment beyond an expression of disagreement.